Good morning, and may it please the Court, I'm Derek Imge, and I represent the appellant who is the underlying relator in this ketamine action. I'd like to reserve three minutes for rebuttal. Okay, I'll try and help you. Thank you. Fortuitously, the Supreme Court recently resolved the primary issue on this appeal, and that issue is whether or not a And that issue that we spent a great amount of time briefing on both sides here is whether or not a false claim liability can attach for a violation of a contractual provision that did not itself expressly condition payment on compliance. Our district court judge premised his entire summary judgment on the following statement of law. He said, under a theory of implied false certification, it is only possible for a claimant to implicitly certify compliance with the law, rule, or regulation if there is a relevant rule, statute, rule, regulation, or contract in place that conditions payment on the claim of compliance with the underlying law, rule, or regulation. Mr. Imge, the problem I have with your implied certification is that it incorporated the ANSI 748 standard, right? And the problem is that the statement of work expressly approved the use of Excel spreadsheets, and therefore excused CERCO from complying. And the provision in the contract said that if there was a conflict, it was the provision in the statement of work that controlled. And the district court thought that was fatal to your claim, and I'm wondering why the district court wasn't right in reaching that conclusion. There's really two elements here that I'd like to address. First, this claim has been about a contractual provision to provide earned value management on this government contract. Earned value management has a definition within the government, and the focus that the district court adopted at the urging of defendants is whether or not ANSI 748 was expressly part of the contract. But my question is, even if it was, and under the contract they were excused by the contracting officer from complying with that provision, then why doesn't that excuse them, as a matter of law, from having to submit reports that are ANSI compliant when they use the manual Excel spreadsheet? Earned value management is more than the use of an Excel spreadsheet versus an automated billing within their monthly report. Can I try it this way? This is how I'm thinking of it, and I want you to correct me if I'm wrong, if you would, please. I fully appreciate what Judge Tallman's talking about, and I don't want to use up too much of your time, so we know about the Statement of Work and we know about the CDRLs and where the conflict arises and whatnot. But it seems to me that your opposing counsel's best argument is that Microsoft Office was permitted, and I think of that spreadsheet as a format, and that we need to distinguish between what format SPWR would accept versus the content of the information to be captured to allow the project management to go forward in the way the government contracted for. Is that your argument? That is, because the CDRL is the format to use the output. It says when the report needs to be made. It's monthly. What format can it be? And it says vendors or contractors' choice on that, and it can be used in Microsoft Excel spreadsheet. Those are format. Nowhere did the government allow CERCO to stop doing earned value management or to do it in a way that would produce false numbers. Well, I think you have an argument that certainly gets my attention in terms of whether or not that's true under the Statement of Work and the CDRLs as we were just talking about. But what about the fact that, and you still have to prove materiality after Escobar, right? Yes. And so what about the deposition testimony that they have submitted between Mitchell and Ellison where they indicate that even though it was, I think, two years after the fact that the Department of Homeland Security said that's okay, you're off the hook. And it reads to me, and I can tell you I'm looking at the Mitchell deposition, he's describing on page 85 through 87, describing a conversation from January of 2010 where he's saying that Landry at DHS did just that, let him off the hook content-wise. What about that? I disagree with that interpretation. There's no content allowance here. So there are two steps in the process here. CERCO requested repeatedly to be relieved of the EVM duty, and it was repeatedly denied by DHS. It was a material part of this contract. They had to perform EVM. But the issue that the deposition testimony talks about is one small segment, and that is a complaint from CERCO that said if we are going to itemize into our automated accounting system thousands of line items so that our we would like to... Right, and so this deposition testimony talks about you don't have to do the 2,000 billing codes. That's all it's saying. Okay. It doesn't say it has to be done in one number, and that's really the issue here. They've taken that one statement or that one discussion to say no longer does CERCO need to collect time and cost into various categories that it's going to report to on a monthly basis. It just says it doesn't have to use its automated system. I thought they ultimately did away with the reports altogether because they were not cost beneficial. That was the request for CERCO for a two-and-a-half to three-year period. We don't want to do these... But isn't that true that that ultimately was the result that they looked at what it was costing to produce the reports, and they said this information is not helping us with managing the project? And of course, we also have the constantly changing the scope of the work that SPOWR was supposed to be engaging. I think what the evidence shows is that in the end of 2012, they changed the reporting of the EVM. They said no longer do you have to do a contract performance report, a CPR. We're going to change it to a CSSR, which... And we submitted the testimony of the CERCO employees that defined what a CSSR is, and she says it's essentially the same as a CPR. But they did more than that. They actually laid off people who had been employed to prepare these reports, didn't they? Including Mr. Kelly. That's correct. This was supposed to be a three-year project to link satellite links between 80 towers. At the end of that two-and-a-half to three-year period, one tower link had been established. This would not be the first time in the history of government contracting, Calvin. But the point of having earned value management is so that the program management office in Washington, D.C. can see that there's not compliance. The contract's behind, it's overpriced, it's not getting done, and they should be able to see that as it's happening on a monthly basis. Well, and... But they didn't want these reports. They agreed to accept a different format. They did not agree to waive EVM. They agreed... Well, but I'm... That's the problem I have. Counsel, I'm looking at page 72. Boy, I wish I had the record side. It's Exhibit B, page 72, Mitchell Deposition. Were you satisfied that this was a workable solution for you? Answer, yes. It meant the requirement that we were trying to do for EVM and DHS had no problem with that. And then it goes on to the next page, and it sounds to me like that D... Again, it's an imitation for you to correct me, but it sounds to me like DHS ultimately accepted this admittedly very different solution. And given that reading, how do you show materiality? Well, I guess I disagree with the premise of this because DHS was never informed that CERCO was not collecting timely hours spent and cost into these categories that it was reporting that it had collected at the end of the month. So explain to me how you think you've met the Escobar Standard. What evidence is there before us that CERCO knowingly violated a requirement that CERCO knew to be material? List it for us and start with what you think is your most compelling item of evidence and go downhill from there. Thank you. We submitted the list in the briefing from our expert witness who went through the various elements of what a proper earned value management program is. Applying ANSI 748 standards, right? It is one and the same. That's correct. Number one, you have to assign charge codes to various groupings of tasks so that those tasks can be budgeted and then measured on a monthly basis. But we're back to the 2000 billing codes, are we not? And a client that was constantly changing the requirements of the contract, which in part explains why at the end of three and a half years there was only one tower constructed. I think we understand that by collapsing 2000, which seems totally unworkable, but anyway, 2000 billing codes to one billing code, the purpose of this EVM system is entirely defeated, right? That's your argument. It's entirely defeated. That's the first half of the argument. But the second half of the argument is when you report that to DHS on a monthly basis, that one set of numbers, that one charge code now miraculously is allocated into thousands of line items, CERCO's presenting on a monthly basis a breakdown of all these charges per task to DHS. DHS has no idea. And you think they were made up? They were. And you think they were made up? That is what the evidence is showing. Okay. And so it seems to me that if we accept this, the Mitchell-Ellison testimony is indicating that the government didn't seem to think this was material. I don't know if I'm going to do that or not, by the way, but at best, doesn't it come two years into the contract? The... But what about the first two years where these things were being presented? Isn't that your argument? For two years they're being presented and accepted? That's correct. That's correct. At some point they said, we want to do this on an Excel spreadsheet. That was accepted by the government, not by DHS, but by... Well, arguably that was accepted at the outset from the CDRLs. The MS office has accepted, I would, on these documents, it sure looks to me like that was the game plan going in. Okay. But again, nowhere was it accepted that they would... But that's format, not content. That's correct. But content, there was no change in the requirement for the content. The content had to be a budgeted list of tasks compared on a monthly basis to actual work done. And it falls apart from the very beginning if you don't collect the actual work done by those budgeted tasks. But if Mitchell had talked to Landry at DHS and told him what they were doing, and the government paid the claims in full, knowing that they were non-compliant with what had been the original intent, doesn't Escobar tell us there's no false claim? Well, Escobar would tell us that weighs into the issue of materiality.  We're dancing around. We haven't heard what we need to hear on materiality if you want to get to where you want to get. Thank you. Well, let me address, first of all, this question here. We have, first of all, no evidence that DHS was aware that they were collecting time on a spreadsheet versus an automated system. But nowhere is there any evidence that DHS or SPAWAR knew that they were only collecting time under one charge code and then, in a meeting, setting it into these different tasks. So it wasn't being reported out on the receiving end as one charge code. It was fanned back out into... That's correct. So the first thing DHS sees is on a monthly basis, thousands of tasks matching what they approved as the budget and saying, oh, okay, we're on track or we're not on track. But not the middle part. They have no idea. That's completely absent. Until two years out. Were they told two years out? Or is it your position that Landry never knew? I have seen no evidence that Landry knew that time was being collected in a single charge code. So what do you think, what is it you think, counsel, that Mr. Landry approved? He approved solely the use of showing the time collected on a spreadsheet. Well, didn't he also... He saw the spreadsheets, right? Landry did not see the spreadsheets, no. Those were done internally between CERCO and SPAWAR, produced into a CPR report, and that's what was shown to... Didn't he also approve, okay, okay, okay, you don't have to use the 2,000 codes, that's too many? Or at least SPAWAR did, right? That's a stretch of the discussion and the testimony. I don't think any... Well, Landry was not a part of that conversation. If I read the testimony that way, between Ellison and SPAWAR, can you win? I think so. Okay, tell me how, please. Whether or not you put it into 2,000 charge codes or a smaller block of charge codes doesn't make a whole lot of difference. But again, no discussion is about the use of one charge code. CERCO did not approach them and say, we want to collect time under one charge code and then we'll allocate it somehow into this value management system. Did CERCO tell DHS or SPAWAR that? No. So they never told... Even the general contractor didn't know that it was being collected under one code? No, that's correct. Because when SPAWAR and CERCO got together to create the monthly report, the spreadsheet was prepared. And that spreadsheet had time allocated out to different tasks, but that's not the way time was collected internally. So is your read of this record that what was relieved is the obligation to collect it under 2,000 codes, but they were never told, that's okay, you can collect it under one? Correct. Okay. You are over time. Thank you. May it please the court. Francis Burke representing Defendant CERCO. I wanted to try to respond to Judge Christian's question. Just to clarify, at the outset, there were no billing codes. The first thing that you do on a job like this is you develop what's called a work breakdown structure that was part of the task. And DHS supplied a sample and then SPAWAR and CERCO working together fleshed that out into the 2,000. And it was only when they had the 2,000 that Ms. Ellison said, look, this thing has been changed already several times and it's changing some more. I'm going to have to charge you every time I have to reprogram the computer to take account of all these task codes. And that's when he said, that's okay. Right. But opposing counsel's point is they never did. That they never did anything more than one code. Is that right? Well, you have to look at this in kind of a branching fork, if you will. But that seems to call for a yes or a no. Did they ever report out, collect more than one? Yes. Okay. Yes. And let me explain. On a daily basis, they enter their time into one task code. And that is what produced the claims that went to the DFAS in Ohio. On a weekly basis, the hours for every employee were given to the SPAWAR managers. And then again, on a monthly basis. And they testified and the judge found that that's what they relied upon to manage this team. That they didn't find the task codes to be useful. Because remember, this was a seven person administrative team. And Mr. Mitchell said, I was with them every day. I knew what they were doing. All I needed to know was roughly how much time they were spending. And that's how I was managing them. Where does Mr. Mitchell say that? I believe he says that on... The judge picks it up in his order at ER 47. And it's undisputed fact number 63. Which I think is 65-1 in their statement of undisputed facts. So, that's how we got to where we got to. In addition to what the panel has been asking Mr. Emge about in terms of the CEDREL. And by the way, the weekly hours report is a CEDREL. That's the first one, I think. And the monthly hours report is also a CEDREL. That's, I think, the second CEDREL. So the SPAWAR managers said, that's what we needed to manage this. We were over there every day. They're both in San Diego. They're meeting constantly. When you say that's what we needed, do you think the record shows that what they needed was one lump sum gross number of the man hours on the project? Not a lump sum. They got a weekly breakdown by employee. Right, but Relator says that the breakdown was made up numbers. That's what he's arguing. No. Well, I think we're talking apples and oranges. What I'm talking about is the hours report, which was entered daily to one charge code. Then that hours report was broken down by worker. Right, and that process of breaking down his argument, as I understand it, is that that was made up. Those were made up numbers. Artificially allocated. What he's talking about is the task billing numbers. And those were certainly not made up. There's testimony in the record that we cited to the court. And he said it was disputed, but where the workers said, we wrote down our time every day into these task codes. Because we knew, at that point in time, we knew what they were. And when they called for them monthly, we just gave them what we had compiled. Let me see if I can help clarify this with a question. So originally, what would have been contemplated was, rather than having a single charge code saying, I billed eight hours today to this particular project, with the 2,000 billing codes, those eight hours would have had to be subdivided into, I spent half an hour on this tower, and I spent another half hour on a different tower. That's what we're talking about, as opposed to... Just to clarify... Is that too simple? No. We're talking about a seven-person administrative team. They weren't working on towers. They were doing things like writing project management plans, risk management plans, and doing and the IMS, the Microsoft project IMS that detailed how this was going to be accomplished. And every time they had to redo it, they had to go back and figure out where are these towers, what seasons can they be worked on, and all that sort of thing. So sort of developing work plans for different aspects of the project. So the reason that Mr. Mitchell said, I didn't care about these breakdowns, was I had seven people. They were doing administrative things. I knew what they were doing, because they were giving me work product. When they wrote a project management plan, they gave it to him. He had to sign off on it and give it to DHS and get it back again. When they did a change management plan, when they developed the Microsoft project codes, they had to sit down together and work out all the numbers. So he said, I knew what they were doing. I didn't need all these task breakdowns. And that's why when Ms. Ellenson said, if I have to put this into the computer, I'm going to have to charge you, he said, I don't want to do that. And didn't those conversations take place two years in? It took place in 2010, which I believe was after the first task order, but before the second, as I recall. And as I said, the reason that it took that amount of time to get to that was they didn't have the billing codes. The first thing they had to do was develop the billing codes. And so it's kind of a chicken and egg problem. So in addition to the point that the panel was making about the seed drill itself, giving flexibility, which Mr. Melanchinsky, who wrote the seed drill said, I wrote it that way because I wanted to give flexibility. But it only gives flexibility in terms of the format, doesn't it? If we construe the facts, right? That's all it says. You can use Microsoft Office. That's true. That's true. But I think what's important is that Judge Hayes specifically found that the alleged DHS and MB regulations, which plaintiffs alleged would have imposed the NC-748 requirement, didn't apply as a matter of law to CERCO. And then he went on to hold that the DFARS, which our government contracting officers are instructed to use when they want to impose NC-748, were not included in the contract. So he specifically found that the EVM-748 requirement was not incorporated by reference into the contract. So it didn't apply as a matter of law. And that is fatal to their claim. Doesn't he make that finding based upon the provision that says if there is a conflict, then you go with a statement of work? No, he didn't base it on that. He based it on the fact that the DFAR regulations say to a government contracting officer, if you want to impose NC-748, here is the language that you put into a contract. But I thought there was a schedule attached to the contract that has a long list of specific provisions, which includes the NC-748. I thought I read that. It's an applicable document section. That's correct. It's an applicable document section. So is that enough to incorporate by reference, compliance with that? No, it's not. And he specifically looked at that. It's like a bibliography, if you will. Well, 2.1 section. Exactly how our expert characterized it. And he said it's common in every contract. And if you look at the list of things there, they're not requirements. But that's not expressly incorporating by reference as if fully set forth herein as a term of the contract. Correct. And we cited, and I understand it's the Federal Circuit opinion, but the Federal Circuit is the one that... They have some expertise in government contract matters. They specifically, in the Northrop Grumman case, hold that if you want to incorporate by reference, you have to use that language. We are incorporating this by reference. And that was critical to Judge Hayes' finding that NC-748 was not incorporated by reference as a matter of law. And you can review his analysis, and I think you'll find it to be very sound. That is fatal, both under EBID, which I think the EBID, holding on page 998 of EBID, specifying what is an implied certification claim in this circuit was not overturned in any way by Escobar. So it's, and the government has filed a couple of statements of interest in the circuit in which it is said the EBID finding was not overturned by Escobar. So it's both under EBID and under Escobar, because Escobar clearly says there has to be an applicable legal requirement either by law, regulation, or contract. And so that in itself is fatal. You've gone on to say, and I think given the rigorous materiality standard set forth in Escobar, that the conversation that we're, my client brought it up to the government and said, if you want us to do this, you'll have to pay us for it. They weren't saying we don't want to do it, they're just saying if you want us to do this, you'll have to pay for it. And he said, no, we brought it up, it's not like we hid it from them. And so that destroys materiality. In addition, Scienter, this circuit is made clear on several occasions in Butler, in Wang, and in Hooper, that when a government contractor discloses a critical fact to the government upon which the plaintiff is relying, that that destroys Scienter under the False Claims Act. So the conversation between Ellison and Mitchell is fatal on both materiality and Scienter. So, and I think the district court made findings on all these points that are embodied in his order, which I think we referenced in our notice of additional authority. He went on to deal with the conspiracy claim, saying that there was no evidence presented that Mitchell, who's a GS-15 lifelong government employee, was in any way acting in bad faith or seeking to defraud the government. He was only trying to save the government some money. And he, the judge, specifically called out on the ER-58 that it's uncontroverted that Mitchell told, informed DHS, which approved the methodology that was agreed upon. And that's Mr. Landry. Yes. Counselor, did you say it's page 998 that I need to look at at EBID to find? I believe it's 998. I have it right here. The critical holding is on 998, and that's the one where the government has said that holding still is applicable and was not overturned by Escobar. And is it EBID? EBID. Yes. Yes. And EBID, by the way, was cited with approval by the DC Circuit and SAIC that the Escobar court relied on pretty heavily to reach its finding. So when you contrast this case to the SAIC case, in SAIC, the DC Circuit specifically found that that was a nuclear contract, and there was a general conflict of interest statute. And the DC Circuit expressly found that the evidence had shown that that statute was specifically incorporated by reference into the contract, and that the witnesses all agreed that it was material, and that three NRC employees testified that if they had known that there was a conflict of interest, that they never would have approved the payments. So that stands in stark contrast to our case, where there was an explicit conversation, it was were the public vouchers, which came directly out of the Serco accounting system, which consisted of the daily time entries, and the plaintiffs have never alleged that there was anything inaccurate or improper about the public vouchers. I think I have one more point that I wanted to make, and then I'll yield the rest of my time. I think I made all my points. Okay. Thank you, Mr. Burke. Thank you. Mr. Emge, I'll give you the remainder of Mr. Burke's time for a rebuttal. Thank you. First, I'd like to address a misstatement made by my opposing counsel here. He suggested that the contract performance reports that were produced to DHS on a monthly basis showed only that Serco performed administrative document review type work. What was presented in the evidence... By the seven people. By those seven people. And it's correct, there are seven people on the EVM team. Right. What about the guys doing the tower work out of it? There's a separate entity called NAFAC, because SPAWAR doesn't have a construction wing. They subcontracted out the actual construction to NAFAC. They reported in a different manner, and that's not part of our case. So these guys were just sort of the planners and project directors? Can I use that term? Well, that's where we get a little bit misleading here. Our expert demonstrated that Serco's time was billed to tasks involving the towers. Well, it is indirectly related, is it not? I mean, it's essentially telling them, you know, work on Mount Baldy, you know, not during the summer months, or it's too hot. Right? That's what they're doing? The specific tasks that were billed would include site inspection. They had to review to see if there was enough structure available or space on the towers to put on the microwave towers. So personnel were going out to the site. They were evaluating. They were doing structural analyses. They were ordering supplies. All of that was run through Serco. They didn't actually put hammer to nail. Somebody else actually installs the hardware. That's correct. But they go out and decide what needs to be... So why does that matter? Because that's what Serco was billing and showing DHS on a monthly basis, that they were doing all these separate tasks out on all of these towers. And that's what our expert looked at and said, now, wait a minute. They budgeted $432.99, which includes, you know, budgeting overhead. And look what happens on the actual reported numbers. It's identical. And that is impossible to do when you're reporting true numbers. And that's why I'm saying these numbers are... The evidence is showing that the numbers were falsified. Okay. I think we have your argument. Your time is up and we'll submit it. Thank you very much. Thank you both. Thank you. Thank you very much.
judges: Parker, Tallman, Christen